UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CORY ROBERT LISINSKI,

                    Plaintiff,          13-CV-00375(MAT)

          v.                            **DECISION and ORDER**

CAROLYN W. COLVIN, Commissioner
of Social Security,

                    Defendant.

_____

## I.   Introduction

     Represented by counsel, Cory Robert Lisinski ("plaintiff")[1]
has brought this action pursuant to Title XVI of the Social
Security Act ("the Act"), seeking review of the final decision of
the Commissioner of Social Security ("the Commissioner") denying
his application for Supplemental Security Income ("SSI"). This
Court has jurisdiction over the matter pursuant to 42 U.S.C.
§§ 405(g), 1383(c).

## II.  Procedural History

     The record reveals that on April 20, 2010, plaintiff's mother,
Jennifer M. Standish, filed an application for SSI on behalf of
plaintiff, alleging a disability onset date of February 16, 2010.
This application was denied, and at Ms. Standish's request, a
hearing was held on November 15, 2011 before an Administrative Law
Judge ("ALJ") Stanley A. Moskal, Jr. The ALJ issued an unfavorable

_____

     [1] Plaintiff (d/o/b March 4, 1994) was an infant under the age
of 18 at the time the original application was filed. By the time
this action was filed April 16, 2013, he was competent to file the
action.

decision on February 24, 2012. The Appeals Council denied review of the ALJ's decision on February 22, 2013. Thereafter, plaintiff timely filed this action seeking review of that denial. Doc. 1.

Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, the Commissioner's motion is granted, and plaintiff's cross-motion is denied.

III. **Summary of Administrative Transcript**

A.   **Medical Evidence**

Plaintiff's medical records indicate primary diagnoses of attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), bipolar disorder, asthma, and Osgood-Slaughter's syndrome (inflammation of the patellar ligament at the tibial tuberosity). The record contains several consultative examinations as well as treatment notes from plaintiff's primary medical and psychiatric providers.

School psychologist Mac I. Barnett completed a confidential psycho-educational evaluation in September 2009, at the request of plaintiff's mother. T. 199-203. School records indicated that in sixth grade, plaintiff's school performance was quite good until seventh grade, at which point it dropped off and plaintiff began exhibiting a pattern of excessive absence and failing grades. Id. Dr. Barnett found that plaintiff was advanced in conversational proficiency; cooperative; had a typical activity level for his

age/grade; was attentive to tasks as typical for age/grade; appeared tense or worried at times; was slow and careful in responding; and generally persisted with difficult tasks as typical for age/grade. Id. Dr. Barnett administered an intelligence test and noted that "implications for the classroom teacher [were] that [plaintiff] ha[d] the intelligence to perform at least at an Average level and showed no significant difficulties thinking by using a Crystallized or Fluid process[.]" T. 201.

Treatment records from the office of Dr. Thomas Szalkowski for the time period September 2003 through March 2010 contain essentially normal physical examination findings, with the exception of episodic illnesses and injuries and diagnoses of asthma, Osgood-Slaughter's syndrome, explosive disorder, ADHD, and ODD. T. 206-358. In July 2009, Dr. Szalkowski noted that plaintiff did not play sports, but had hobbies and got along with several peers and his parents. T. 305. Plaintiff did not have anxiety issues, but drank alcohol and smoked cigarettes. Id. Plaintiff was on probation from a criminal mischief charge that occurred when he was 13. T. 306. Plaintiff had violated the conditions of an adjournment in contemplation of dismissal, and therefore probation was imposed for an additional year. Id.

On November 18, 2009, Dr. Szalkowski found that plaintiff was physically qualified for sports/full playground activity and physically qualified for employment. T. 265. On March 19, 2010, after plaintiff had "missed significant days of school due to

varying illnesses, recently abdominal pain with persistent diarrhea," Dr. Szalkowski noted in a letter to plaintiff's school that plaintiff and his mother requested that plaintiff be home tutored due to plaintiff's and his mother's desire to "catch him up" before going back to school. T. 238. Dr. Szalkowski stated that his preference, however, would be for plaintiff to return to school if this was at all possible, and noted that he had encouraged plaintiff to return to school. Id.

Plaintiff treated with psychiatrist Christopher Pino from sometime in 2007 through May 2010. T. 360-63. Treatment notes reflect diagnoses of bipolar disorder, ADHD, and ODD. In August 2009, Dr. Pino found that on mental status exam, plaintiff had anxious mood and labile affect; his short and long-term memory were normal, but concentration was impaired without medication; he showed no signs of psychosis, "but can tell some very dramatic stories as attention seeking." T. 361, 454. In May 2010, Dr. Pino noted that although plaintiff took medication (prescribed by school psychiatrist Dr. Hashim) for mental conditions, [h]is mood swings [were] not under control [and] he remains a risk for being in school." T. 360. Dr. Pino recommended home instruction through the end of the school year. Id.

On June 30, 2010, Dr. Donna Miller completed a pediatric examination at the request of the SSA. T. 382-86. Dr. Miller noted that "[o]n a typical day [plaintiff] watches TV, listens to music, plays sports, draws, and uses the computer." T. 384. Physical exam

was essentially normal. T. 384-85. Dr. Miller noted that plaintiff related with her "in an age-appropriate way," and "appeared to have [a] normal attention span for [his] age." T. 384. Dr. Miller diagnosed asthma, Osgood-Schlatter's syndrome, and chronic intermittent back pain, and noted a stable prognosis. T. 385-86. Dr. Miller stated that plaintiff could "participate in all age-appropriate activities," but that she would recommend "limiting sport activities secondary to his Osgood-Schlatter." T. 386.

Susan Santarpia, Ph.D., completed a child psychiatric evaluation on June 30, 2010 at the request of the SSA. T. 387-91. At that exam, plaintiff and his mother reported past diagnoses of ADHD, bipolar disorder, ODD, intermittent rage disorder, and PTSD, "which stems from a life-threatening trauma when he was beaten by his biological father at age 7 and forced to do drugs." T. 387. Plaintiff reported using cannabis and drinking alcohol, to which behavior his "mother did not demonstrate any apparent objection." T. 388. He had just been released from a three-year probation associated with a criminal mischief charge. Id. Dr. Santarpia assessed plaintiff's mood as euthymic, attention and concentration as age-appropriate, cognitive functioning as average, insight poor, and judgment poor "due to the claimant being parented in a way that allows a 16-year-old to live with his girlfriend, use marijuana, and drink alcohol." T. 389-90. Plaintiff was able to bathe, dress, and groom himself appropriately, help out with household chores, and travel the neighborhood independently, and had normal sleep and

5

appetite. T. 387, 390. Plaintiff had been seeing his girlfriend for three years and "spen[t] his days with his girlfriend." Id. Dr. Santarpia opined that plaintiff could understand directions and perform most tasks age-appropriately, with mild impairment in maintaining appropriate social behavior and interacting adequately with peers and adults. Id. She concluded that the results of her evaluation were "consistent with psychiatric problems, but in itself, this [did] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." Id. On Axis I, she diagnosed plaintiff with disruptive behavior disorder, not otherwise specified ("NOS"). Id. She assessed a poor prognosis "given [plaintiff's] current level of living situation and poor parental skills." T. 391. Dr. Santarpia also completed a child intelligence evaluation, in which she assessed a full-scale IQ of 88, which put plaintiff in the low average to average range of abilities. T. 395.

Dr. J. Meyer completed a childhood disability evaluation form in August 2010. T. 397-402. Dr. Meyer found that plaintiff had an impairment or combination of impairments that were severe, but did not medically equal or functionally equal a listed impairment. T. 397. Dr. Meyer assessed no limitation in the domains of interacting and relating with others, moving about and manipulating objects, and caring for yourself, less than marked limitation in the domains of acquiring and using information and health and physical well-being, and marked limitation in the domain of

6

attending and completing tasks. T. 399-400. Dr. Meyer noted that plaintiff was currently living with his girlfriend and girlfriend's mother, that he was possibly abusing alcohol, and that he was non-compliant with medications. T. 399.

Nurse practitioner Gerald E. Turk examined plaintiff on August 9, 2010. T. 403-10, 462. NP Turk took an extensive history from plaintiff and plaintiff's mother, and noted that plaintiff complained of past physical abuse by his father and sexual abuse from nonfamily member, and that plaintiff "has acquired many legal problems and has been accused of attempted rape and property destruction." T. 403-06. NP Turk stated that plaintiff "seeks disability and an alternate school situation so that he will avoid further legal problems." T. 406. Plaintiff and his mother reported that "at the age of 13 he cut his wrist while intoxicated on alcohol and subsequently required surgery to address tendon damage." T. 403; see T. 383 (noting 2007 surgery). They also reported that plaintiff had voiced suicide threats on five different occasions prior to August 9, 2010. T. 404. NP Turk diagnosed plaintiff, on Axis I, with bipolar disorder, NOS; ADHD, combined type; continuous cannabis dependence; and "[a]buse of a [c]hild, physical and sexual." T. 406. Plaintiff requested Geodon for psychiatric treatment, which NP Turk agreed to prescribe, noting that if this medication was unsuccessful plaintiff would be willing to try lithium. Id. Plaintiff was continued on Prozac and Adderall. Id.

Psychiatric treatment notes dated September 2010 through September 2011 indicate that plaintiff's psychiatric conditions were controlled with medications. T. 463-82. However, plaintiff had a pattern of repeated cancellations and lateness for appointments. T. 475. When plaintiff's mental status was assessed, it was either normal or normal except that plaintiff did not present as reasonable, rational, or insightful. T. 463 (September 13, 2010 exam noting labile mood, defiance, and poor insight), 464 (October 14, 2010 exam noting limited insight), 468 (May 3, 2011 exam noting impulsivity and impaired judgment), 470 (May 10, 2011 exam was normal), 480, 482 (July 28 and September 1, 2011 exams normal except for limitations in reason, rationality, and insight). In September 2010, treatment notes indicated that plaintiff continued THC use; in October 2010, plaintiff was home schooling and his girlfriend had had a miscarriage; and in April 2011, plaintiff's girlfriend was once again pregnant. T. 463-65.

**B.   Education Records**

A section 504 student accommodation plan dated January 2010, noting that plaintiff "struggle[d] to complete tests and exams in the allotted time based upon his anxiety to meet the time limit and the distractions in large classrooms," recommended a flexible testing setting which would give plaintiff extended time to complete exams and allow him to be separated from fellow students during tests. T. 204, 375, 377, 435-36. Nothing in the plan indicates that accommodations were necessary for any reasons other

than plaintiff's difficulty completing testing on time and without distractions. T. 435-36.

Education records for the 2009-2010 school year show excessive absences and tardies, with excuses ranging from substantiated medical issues to multiple instances of oversleeping, "car trouble," "traffic," and "personal" absences; many absences and tardies were simply unexcused. T. 412-14. During that school year, plaintiff was absent from school anywhere from six to twenty-two times each month for these various reasons. Id. Plaintiff exhibited a similar attendance pattern in previous school years. T. 418-25.

Social worker Karen Dillon noted in September 2009 that according to plaintiff's mother, "[plaintiff's and his mother's] relationship could become volatile if [plaintiff] did not get his way." T. 437. Ms. Dillon noted that plaintiff had a history of psychiatric issues, including "a history of suicidal threats [and] ideations," and that plaintiff took medication to control these mental health issues. Id. Ms. Dillon stated that plaintiff had a girlfriend, and "[m]uch of his world revolves around their relationship"; he "did not like attending NT Middle School [and] as a result, missed most of the school year." Id. Plaintiff reported to Ms. Dillon that "he felt extremely uncomfortable in the school environment," and "reported that students picked on him [and] he did not feel safe." Id. According to Ms. Dillon, plaintiff made use of their counseling sessions and "easily engaged in a therapeutic counseling relationship." Id.

9

A June 2010 teacher questionnaire from plaintiff's guidance counselor, Robert Derrett, noted excessive absences due to "health and emotional issues," and stated that plaintiff had been home schooling since May 3, 2010. T. 152. Mr. Derrett stated:

> It appears to me that [plaintiff] chooses not to apply himself in school. His comprehension for school activities, assignments, studying, etc. seems directly related to his motivation (his "want" to do work) not a disability. He understands concepts with the literature but also seems to better understand the concept of manipulating his "condition," and avoiding doing work. In my estimation it's not a question of needing or using support and structure, it's a need for self-motivation and applied effort.

T. 153. Mr. Derrett rated plaintiff as having either no or a slight problem in various areas of acquiring and using information; some serious problems in areas related to attending and completing tasks; several "obvious" problems and otherwise no or slight problems in interacting and relating with others; no problems in moving about or manipulating objects; and several "obvious" problems and otherwise no or slight problems in caring for himself. T. 153-58. Regarding interacting and relating with others, Mr. Derrett noted that he was not aware of any behavior modification strategies being implemented for plaintiff and that Mr. Derrett almost always understood plaintiff's speech. T. 155-56. Regarding caring for himself, Mr. Derrett opined that plaintiff "ha[d] his priorities mixed up. School is mainly a vehicle for socialization with [his] current girlfriend." T. 157. According to Mr. Derrett, plaintiff had "had some legitimate illness and stress, but [plaintiff's] way of dealing with it is long term absences,

falling behind in his work, and justifying his failures by excuses," which Mr. Derrett assessed as "[a] defense mechanism of sorts." Id.

### C.    Non-Medical and Testimonial Evidence

At the hearing, plaintiff testified that through seventh grade, he "did pretty good, but after seventh, it became very hard . . . with concentration." T. 43. He testified that he was prescribed medication, but that each time he had to be "switched to something else because it stopped working." Id. Plaintiff testified that he "desperately need[ed]" his bipolar disorder medication because he "get[s] very, very mean without it." T. 44. Plaintiff testified that he had problems with people at school, including teachers and students, specifically stating that "lately" he had a problem "with the maturity level of the other students," and that he found himself getting "irritated very fast and [found it] to be an unsafe situation for [him]self." T. 45. Plaintiff testified that he was convicted of criminal mischief when he was 13, and that he had not had legal trouble since serving out his probation. T. 46. He stated that he had a daughter, "and that ha[d] taught [him] to control [him]self a little bit better"; he "usually wait[ed] until outside of school to take out any rage against anyone [he] may have a rage against." Id. He stated that he was only in school "a few days" that year, stating, "I couldn't trust myself in the situation any more due to the fact of all the kids were a lot younger than me, a lot more mature, and I found myself getting very, very angry

very fast." T. 46-47. He testified that he planned to get a GED. T. 47.

Plaintiff testified that about a year prior, he attacked a male who allegedly raped his girlfriend, and "put [him] in the hospital for a month." T. 49. Plaintiff testified that he did not have any friends. T. 50. He stated that he was responsible for chores at home, including sweeping the floor, doing dishes, and wiping down counters, but that he "spen[t] most of [his] time watching TV." T. 54. Plaintiff testified that he had "broken quite a few things in rages," and that he "like[d] to punch things that could hurt [him]," stating, "Its not the destruction I like . . . its just . . . the release of anger more than anything." T. 58. Plaintiff's mother testified that he was manipulative and self-centered, testifying that "[h]e wants to make the self happy, and it doesn't matter what cost." T. 59.

In a function report dated April 20, 2010, plaintiff's mother reported that plaintiff had no problems seeing, hearing, talking, communicating, understanding and using what he learned, no limitations in physical activities, and no impairments affecting his social activities or behavior with other people. T. 144-48. Plaintiff's mother reported that he had limitations going to school full-time, taking care of his personal needs and safety (noting problems getting to school on time, accepting criticism or correction, keeping out of trouble, and obeying rules), and paying attention and sticking with a task (noting limitations in all areas

12

listed). T. 146, 149-50. In a disability report dated October 25, 2010, plaintiff's mother reported that plaintiff was "making home life difficult for family," "thinks he should have adult [privileges] [and] treatment without responsibility," "participated with alcohol [and] marijuana, [and] possibly pills, just to cope," and "wants to go out on own because he doesn't like to be told what to do or follow rules." T. 173.

## IV.  Applicable Law

### A.    Standard of Review

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Social Security Act ("the Act"), the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d

172, 179 (2d Cir. 2003) (citing <u>Townley v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984)).

**B.   Legal Standard for Disability Claims of Children**

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Pursuant to this statutory dictate, the Social Security Administration has promulgated, by regulation, a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of a disability. <u>Encarnacion ex rel. George v. Astrue</u>, 586 F.3d 72, 75 (2d Cir.2009) (citing 20 C.F.R. § 416.924 et seq.). Under this analysis, the plaintiff must show that: (1) the child was not engaged in substantial gainful activity; (2) the child had a "severe" impairment or combination of impairments; and (3) the child's impairment(s) met, medically equaled, or functionally equaled the severity of a listed impairment. 20 C.F.R. § 416.924. At the third step, "[f]or a child's impairment to functionally equal a listed impairment, the impairment must 'result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.'" <u>Encarnacion</u>, 568 F.3d at 75 (quoting 20 C.F.R. § 416 .926a(a)). A child's limitations are evaluated in the context of the following six domains of functioning:

```
(1) acquiring and using information;
(2) attending and completing tasks;
(3) interacting and relating with others;
(4) moving about and manipulating objects;
(5) caring for oneself; and
(6) health and physical well-being.
```

20 C.F.R. § 416.926a(b)(1).

## V.   The ALJ's Decision

The ALJ found that plaintiff was an adolescent (see 20 C.F.R. § 416.926a(g)(2)) who had not engaged in substantial gainful activity since February 16, 2010. T. 14. The ALJ found that plaintiff suffered from the following severe impairments: ADHD, ODD, bipolar disorder, asthma, and Osgood-Slaughter's syndrome. Id. At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925, 416.926). T. 14-28.

## VI.  Discussion

Plaintiff contends that the ALJ erred in (1) finding that plaintiff did not have a marked impairment in the domain of interacting and relating with others; (2) finding that plaintiff did not have a marked impairment in the domain of caring for himself; and (3) evaluating plaintiff's and plaintiff's mother's credibility. Doc. 14-1.

15

**A.   The ALJ's Evaluation of the Domain of Interacting and Relating With Others**

Plaintiff contends that the ALJ's conclusion that plaintiff did not have a marked impairment in interacting and relating with others is not supported by substantial evidence. Specifically, plaintiff argues that the ALJ erred in giving weight to Dr. Santarpia's and Dr. Meyer's assessments, and points to plaintiff's and plaintiff's mother's reports of his difficulties getting along with others.

The ALJ found that the evidence "demonstrate[d] that the claimant ha[d] some problems interacting with others, but that he has had a long-term relationship with a girlfriend, he has never been suspended from school for fighting and can generally get along with others." T. 23. In evaluating this domain, the ALJ considered the consulting examination of Drs. Santarpia and Meyer, plaintiff's school records and psychiatric treatment records, plaintiff's testimony, and Mr. Derrett's teacher questionnaire. T. 22-24.

For plaintiff's age group (age 12 to 18), the regulations provide that the adolescent should be able to initiate friendships with peers and interact appropriately with adults, recognize that there are different social rules for adults and peers, and "intelligibly express [his] feelings, ask for assistance in getting [his] needs met, seek information, describe events, and tell stories, in all kinds of environments . . ., and with all types of people[.]" 20 C.F.R. § 416.926a(i)(2)(v). Examples of limited

16

functioning applicable to adolescents include withdrawing from people the child knows, having difficulty in communication, and difficulty speaking intelligibly or with fluency. 20 C.F.R. § 416.926a(i)(3)(iii), (v), (vi). The regulations' focus in this domain is thus on the adolescent's ability to communicate with, and interact appropriately with, both peers and adults.

Dr. Santarpia concluded that plaintiff had a mild impairment in maintaining appropriate social behavior and interacting adequately with peers and adults, noting that plaintiff had maintained a three-year relationship with his girlfriend and that his mother's permissive parenting style contributed to plaintiff's poor judgment. T. 389-91. Dr. Meyer concluded, without elucidating, that plaintiff had no limitations in this domain. T. 399. The Court notes that the ALJ did not give weight to Dr. Meyer's assessment, but rather found that plaintiff had a less than marked limitation in this domain. T. 24.

Although plaintiff exhibited some problems, including those noted by Dr. Santarpia and certain "obvious" problems noted by Mr. Derrett (such as problems playing cooperatively, seeking attention appropriately, expressing anger appropriately, asking permission appropriately, following rules, and relating experiences and telling stories), plaintiff was able to communicate appropriately, both with medical and educational personnel throughout treatment and consultation and at the hearing, and maintained a long-term relationship with his girlfriend. School

psychologist Dr. Barnett noted that plaintiff was advanced in conversational proficiency and cooperative, and plaintiff's guidance counselor, Mr. Derrett, noted that he was not aware of any behavior modification strategies implemented for plaintiff and that he was able to understand plaintiff's speech. T. 200. Moreover, the record indicates that plaintiff actually exhibited a great deal of control over and manipulation of the relationships in his life. See, e.g., T. 59 (plaintiff's mother testified that plaintiff behaves so as "to make the self happy, and it doesn't matter what cost"), 153 (Mr. Derrett opined that plaintiff "manipulat[ed] his 'condition,' [to] avoid[] doing work").

Treatment notes from plaintiff's treating physicians also substantially support the ALJ's finding. Although Dr. Pino stated that plaintiff was a risk for being in school due to mood swings (T. 360), around that same time period (the end of the 2009-2010 school year), Dr. Szalkowski stated that plaintiff and his mother requested the plaintiff be home schooled but Dr. Szalkowski did not agree with this approach, noting that he had encouraged plaintiff to return to school. T. 238. In psychiatric treatment from September 2010 through September 2011, plaintiff was repeatedly assessed as normal in mental status exams, with the exception of limited insight and judgment. T. 463-64, 468, 470, 480, 482. Additionally, plaintiff's mother reported, in a function report related to this claim, that plaintiff did not have any impairments affecting his social activities or behavior with other people.

18

T. 148. Thus, although the record reflects that plaintiff did have limitations in this domain, the ALJ's conclusion that those limitations were not marked is supported by substantial record evidence.

**B.    The ALJ's Evaluation of the Domain of Caring for Himself**

Plaintiff contends that the ALJ's conclusion that plaintiff did not have a marked impairment in the domain of caring for himself is not supported by substantial evidence. The domain of caring for oneself relates to how well an individual "maintain[s] a healthy emotional and physical state," including how well one gets "physical and emotional wants and needs met in appropriate ways, . . . cope[s] with stress and changes in . . . environment," and whether one "takes care of [his] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). In the adolescent age range, limitations in this domain include limitations in bathing and dressing oneself, self-soothing behaviors, self-injurious behaviors, disturbance in eating or sleeping patterns, and failure to spontaneously pursue enjoyable activities or interests. 20 C.F.R. § 416.926a(k)(3)(ii), (iii), (iv), (v), (vi).

The ALJ found that plaintiff had no limitations in caring for himself. T. 25-26. In evaluating this domain, the ALJ cited Dr. Santarpia's and Dr. Meyer's consulting examinations, noting that plaintiff had normal sleep and appetite, was able to dress, bathe, and groom himself as age-appropriate, had hobbies and interests, and had fair insight but poor judgment. Id. (referencing

T. 387-91). The ALJ also noted Dr. Santarpia's findings that plaintiff could respond appropriately to changes in the environment, ask questions and request assistance in an age-appropriate manner, and was able to be aware of danger and take immediate precautions within normal limits. Id.

As plaintiff points out, Mr. Derrett noted "obvious" problems in plaintiff's abilities to appropriately assert emotional needs, respond to changes in his mood, and use coping skills to meet the daily needs of the school environment. T. 157. However, the form used by Mr. Derrett included options in these areas for "serious" or "very serious" problems. Considering the form, and not discounting the nature of plaintiff's limitations as reported by Mr. Derrett, it appears clear that Mr. Derrett did not see these limitations as on the upper-level scale of seriousness when he assessed them. T. 157. Significantly, Mr. Derrett did note "serious" or "very serious" problems in certain areas of attending and completing tasks, indicating that Mr. Derrett evaluated each domain on a continuum, as the form requested, from "no problem" to a "very serious" problem. T. 154. Moreover, as noted above, treatment records indicate that plaintiff was assessed as normal in mental status examinations with the exception of limited insight and judgment. T. 463-64, 468, 470, 480, 482. Plaintiff was also able to dress, bathe, and groom himself, and reported that he had normal sleep and appetite and could do basic chores around the

house, but spent most of his time watching TV, playing sports, drawing, and using the computer. T. 54, 384, 387, 390.

The Court takes very seriously the assertion that plaintiff has engaged in suicidal ideation and has had one prior suicide attempt. Plaintiff and his mother reported that "at the age of 13 he cut his wrist while intoxicated on alcohol and subsequently required surgery to address tendon damage," and stated that plaintiff had voiced suicide threats five times. T. 403-04; see T. 383 (noting 2007 surgery). School social worker Ms. Dillon noted in September 2009 that plaintiff had "a history of suicidal threats [and] ideations." T. 437. The record also contains evidence of two instances of plaintiff "blacking out" and punching objects with his fist, causing pain and swelling to his hand. Specifically, on October 1, 2008, it was noted that a right hand injury was possibly due to explosive disorder; follow-up revealed no fracture. T. 340, 343. On September 10, 2008, plaintiff reported that he hit an oak dresser with his right fist; his fist was assessed on physical exam as unremarkable. T. 347, 350. Plaintiff testified that he hit objects as a "release of anger." T. 58. All of these behaviors were occurred more than a year prior to plaintiff's alleged disability onset date.

The evidence in the record indicates that by the alleged disability onset date of February 16, 2010, plaintiff's mental conditions were controlled with medication and plaintiff was routinely assessed in treatment as having an essentially normal

mental state. T. 406 (August 9, 2010 mental status examination revealed no homicidal or suicidal ideation), 463-82 (treatment notes indicated essentially normal mental status exams, with the exception of limited insight and judgment). Moreover, in April 2010, plaintiff's mother reported that his limitations in taking care of his own personal needs and safety included only problems getting to school on time, accepting criticism or correction, keeping out of trouble, and obeying rules; she did not list any concerns about self-harm. T. 149. She reported that he took his medication, avoided accidents, and asked for help when needed. Id.

Considering the above review of the evidence, the Court finds that the record substantially supports a conclusion that plaintiff had, at most, a less than marked impairment in this domain of functioning. The Court finds that to the extent that the ALJ erred in finding no impairment where he should have found a less than marked impairment, that error was harmless. See, e.g., Ruff ex rel. LMF v. Colvin, 2015 WL 694918, *11 (S.D.N.Y. Feb. 18, 2015) (noting that finding of "no limitation" amounts to harmless error where the limitation is actually "less than marked"). Because substantial evidence supports a conclusion that plaintiff suffered a less than marked impairment in this domain and any error in finding no limitation was harmless, the ALJ's conclusion will not be disturbed.

C.    The ALJ's Credibility Determination

Plaintiff argues that the ALJ erred in not crediting plaintiff and his mother's testimony regarding plaintiff's symptoms. In the context of his discussion of the record and consideration of the six relevant domains, the ALJ cited, among other sources, 20 C.F.R. § 416.929 and SSR 96-7p. T. 15. He went on to state that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record." Id. After summarizing the testimony of both plaintiff and his mother, the ALJ concluded that, although there were medically determinable impairments that could reasonably be expected to produce the alleged symptoms, the statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the finding that plaintiff did not have an impairment or combination of impairments which functionally equaled the listings. T. 16.

The subsequent discussion, which incorporates a review of the testimony, indicates that the ALJ used the proper standard in assessing credibility, especially in light of the fact that the ALJ cited relevant authorities in that regard. See Britt v. Astrue, 486 F. App'x 161, 164 (2d Cir. 2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96-7p as evidence that the ALJ used

23

the proper legal standard in assessing the claimant's credibility);
Judelsohn v. Astrue, 2012 WL 2401587, *6 (W.D.N.Y. June 25, 2012)
("Failure to expressly consider every factor set forth in the
regulations is not grounds for remand where the reasons for the
ALJ's determination of credibility are sufficiently specific to
conclude that he considered the entire evidentiary record."). The
ALJ referenced relevant testimony throughout his discussion of the
six domains. T. 20 (noting, in assessing acquiring and using
information, that neither plaintiff nor his mother testified to any
problems in this arena), T. 22 (in assessing attending and
completing tasks, crediting plaintiff's and his mother's testimony
that behavioral problems interfered with school functioning), T. 23
(in assessing interacting and relating with others, citing
plaintiff's testimony that he did not have any friends, but noting
plaintiff's mother's report that he could make friends but not keep
them, and noting plaintiff's long-term relationship with a
girlfriend), T. 27 (noting, under domain of health and physical
well-being, that plaintiff's testimony was inconsistent with
medical records). The ALJ's decision therefore reflects that he
properly applied the two-step credibility test set forth in the
regulations (see 20 C.F.R. § 416.929), and his credibility
determination will not be disturbed.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for
judgment on the pleadings (Doc. 13) is granted, and plaintiff's

cross-motion (Doc. 14) is denied. The ALJ's finding that plaintiff was not disabled is supported by substantial evidence in the record, and accordingly, the Complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____
MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          August 3, 2015